UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FRANK FIDEL BELTRAN,

           Petitioner,

      v.

K. HARRINGTON, Warden,

           Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 10-5525-GW (SP)

FINAL REPORT AND
RECOMMENDATION OF UNITED
STATES MAGISTRATE JUDGE

      This Final Report and Recommendation is submitted to the Honorable

George H. Wu, United States District Judge, pursuant to the provisions of 28

U.S.C. § 636 and General Order 05-07 of the United States District Court for the

Central District of California.

## I.

## INTRODUCTION

      Petitioner Frank Fidel Beltran filed his First Amended Petition ("FAP") for

Writ of Habeas Corpus by a Person in State Custody on May 2, 2011.   Petitioner

challenges his 2007 convictions for premeditated attempted murder, first degree

burglary, assault with a firearm, false imprisonment, and assault with a firearm on

a peace officer, along with several firearm enhancement allegations.

Petitioner asserts six grounds for relief: (1) judicial misconduct in calling attention to petitioner's nontestimonial conduct; (2) false evidence was used to convict him; (3) ineffective assistance of trial counsel, with multiple subclaims; (4) prosecutorial misconduct due to failure to disclose exculpatory evidence; (5) insufficient evidence petitioner knew the victim officer was a peace officer; and (6) insufficient evidence petitioner fired shots at the victim officer with premeditation.

For the reasons discussed below, none of petitioner's claims merits habeas relief.  It is therefore recommended that the First Amended Petition be denied.

## II.

## STATEMENT OF FACTS[1]

This case arises out of two shooting incidents.  In the first, on February 10, 2006, petitioner shot Glendora Police Officer Casey O'Gorman after committing armed assaults and falsely imprisoning his wife, Anjelique Beltran ("Anjelique"), along with Sara Calleros and Jonathan Murray.  The second incident took place on March 3, 2006, when petitioner repeatedly shot his wife after pursuing her in a dangerous high speed chase.

**Prosecution Case**

*The February 10 Incident*

In late 2005 and early 2006, Anjelique lived with petitioner (her husband of 10 years) and their seven-year-old daughter L. in petitioner's family home in La

---

[1]   The facts set forth are drawn substantially verbatim from the California Court of Appeal's decision on direct appeal.  *See* Lodged Doc. 7 at 2, 3-12.  Such statement of facts is presumed correct.  28 U.S.C. § 2254(e)(1); *Vasquez v. Kirkland*, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).  A petitioner must present clear and convincing evidence to rebut this presumption.  *Id.*  Petitioner has offered no such evidence here.

Verne.  Petitioner was arrested on an unrelated matter and taken into custody on January 8, 2006.  Anjelique and her daughter moved out shortly afterwards, staying in a succession of motels.  Petitioner was released on February 2, 2006.  Two days later, he and Anjelique began to argue while they were in a parked car with L.  Petitioner became upset, pulled out a knife, and stabbed Anjelique's hand as she tried to defend herself.  Petitioner apologized and cut his own chest before taking her to the hospital.

Anjelique decided to take L. and move away from petitioner.  She tried to keep their whereabouts secret from him.  On February 10, 2006, she went to Murray's home with L. and Calleros.  Later that day, she drove her white Mustang to an alley in Pomona where she had arranged to meet an acquaintance who would give her some money.  Petitioner, however, was there with the acquaintance.  He pistol whipped Anjelique in the head and ordered her into the back of the Mustang.  He demanded that she direct him to L., which she did.  When they arrived at the Murray residence, L. was in the living room eating a snack.  Two other men came inside and petitioner had them drive L. away.  When L. had been removed, petitioner handcuffed Anjelique, Murray, and Calleros.  While petitioner threatened Murray and Calleros with a gun, Anjelique went to the kitchen and dialed 9-1-1 on a cordless telephone.  To avoid being seen by petitioner, she walked over to the bathroom, dropped the phone, and kicked it away from her.  Louie Acosta was hiding in the bathroom; she told him to stay there.[2]  Anjelique heard petitioner say, "I think the cops are here."  Petitioner told Murray to get a saw to cut off the handcuffs.  As petitioner led the others to the backyard,

---

[2]   While in Murray's bedroom, Louie Acosta separately called the 9-1-1 operator.  Acosta was on probation for possession of methamphetamine at the time of trial, but he was not using it on the day of the shooting.

Anjelique ran out the front door and across the street, where she hid in a bush.

Calleros testified that she, Anjelique, and L. visited Murray's residence on the afternoon of February 10, 2006. Anjelique left the home for approximately 90 minutes in the company of others. It was dark outside when she returned. Calleros saw Anjelique's car stop and park. Anjelique entered the residence with petitioner,[3] who had a gun in his gloved hand. Two men also entered the residence. Petitioner told them to take L. away.[4] Petitioner ordered Calleros and Murray to lie prostrate and look at the floor. Calleros recalled that petitioner tied up Murray and handcuffed Calleros's hands behind her. He also handcuffed Anjelique. Petitioner tapped Calleros on the side of her head with his gun as he deliberated aloud whom he would kill. At one point, he threatened Calleros with a knife and told her that he would be doing her a favor by killing her, telling her to "make [her] peace with God." Petitioner told Murray that he would be found "in a puddle of blood." Petitioner demanded Calleros identify the person Anjelique "was sleeping with." When she named "Danny," petitioner appeared to relent and said he would uncuff her – but he could not find the key. Petitioner untied Murray, who went to the garage for a "grinder," which he used to remove the

---

[3]   Calleros did not identify petitioner in court. She referred to him as Anjelique's husband, based on what Anjelique told her after the incident. Calleros identified petitioner's photograph as being the gunman when previously shown a photographic lineup.

[4]   Anthony Rivas testified that he had known petitioner for approximately two years. In the late afternoon of February 10, 2006, petitioner called Rivas and asked for a ride. Conversing on their cell phones, petitioner directed Rivas to his location. Petitioner approached Rivas and asked him to take his daughter L. to petitioner's mother's house in La Verne because petitioner and Anjelique "were arguing a little bit." Petitioner went inside the residence and returned with L. Rivas was familiar with petitioner's family and their La Verne residence and drove L. to that location, where Rivas dropped off L. with petitioner's brother-in-law.

1   handcuffs.

2         Petitioner said he saw a police patrol car at the corner of the street.  As the

3   police approached the front door, petitioner ordered Calleros to leave with him

4   through the back of the residence.  Anjelique, however, ran to the front and

5   opened the door for the police.  Calleros ran through the backyard.  Calleros heard

6   two or three gunshots fired in a short space of time.  After that, petitioner jumped

7   out of a window into the backyard, ran past Calleros – telling her that he knew

8   where she lived – and jumped over the backyard wall.  Calleros went back inside

9   the residence.  She saw some bullet cases on the living room floor near the front

10  window.

11        On cross-examination, Calleros admitted that she, Anjelique, and Murray

12  were using methamphetamine in the residence before petitioner arrived; Murray

13  and Acosta denied it.  According to Calleros, Anjelique was a regular user.

14  Anjelique had been living with Calleros in West Covina, but approximately a

15  week before the shooting incident, Anjelique told her petitioner was being

16  released from custody and she was "going to go back home with him."

17        Murray recalled that on the afternoon of the shooting, he was in his family

18  home with Acosta when Calleros arrived with Anjelique and her daughter.

19  Anjelique left for a few hours and returned with petitioner.  Petitioner ordered him

20  to lie face-down on the floor.  Petitioner handcuffed Anjelique and Calleros.

21  Petitioner threatened to shoot Murray unless he complied with his orders.

22  Petitioner used the phrase, "enee menee minee moe" as he tried to decide whether

23  to kill Calleros or Murray first.

24        Officer O'Gorman was wearing his full police uniform and on duty when he

25  received a radio call and responded to the Murray residence in response to a 9-1-1

26

27

28

5

emergency call.[5]  He arrived within five minutes, parked his patrol car up the street, and walked toward the residence.  It was nighttime and the officer carried a flashlight in his right hand.  Within a few minutes, Officer Shiloh Catanese arrived.  The two met one house south of the Murray residence, which was quiet and dark inside.  As Officer O'Gorman approached the front door, it burst open and Anjelique ran out and toward Officer Catanese.  Anjelique appeared to be terrified. Officer O'Gorman drew his service revolver in his left hand.  He took two steps toward the front door with his lighted flashlight pointed forward just below his revolver.

Petitioner emerged from the front door, firing a handgun.[6]  Officer O'Gorman was in the process of lifting his handgun to the "high ready position," when petitioner's first shot struck the officer in his right hand from a distance of approximately eight feet.  At that time, the officer's weapon was held at chest height.  The bullet passed through his palm, knocking the flashlight out of his hand.  As Officer O'Gorman backed up and looked for cover, petitioner retreated into the residence and fired a second shot through a window.  The shot whizzed past the officer's shoulder.  He dove behind a nearby car and fired back into the residence window.  The officer's injury prevented him from holding the firearm properly, causing it to jam.  He ducked down behind the car again and tried to eject the casing that was lodged in the weapon's slide.  Unable to do so, he ran for cover toward a van parked in the next door driveway.  Unbeknownst to him, however, Officer Catanese, was behind that vehicle.  She mistook him for

---

[5]   It was stipulated that Officer O'Gorman was a peace officer for purposes of the special allegations under sections 664, subdivision (e), and 245, subdivision (d)(2).

[6]   Officer O'Gorman did not get a clear view of his assailant's face and was not able to identify petitioner.

6

1  petitioner and fired at him – but missed.  As they heard gunshots and slamming
2  doors, the two officers climbed a fence into a neighbor's backyard and ran up the
3  street toward the police units that were responding to the scene.[7]  The officer
4  received medical treatment and underwent physical therapy for the gunshot
5  wound, but as of the time of trial he had not fully recovered the use of his thumb.

6       Phillip Scheurich lived close to the Murray residence.  At approximately
7  11:00 p.m. on February 10, he went outside to smoke a cigarette when he saw a
8  police helicopter circling a few blocks away and shining a spotlight.  Within ten
9  minutes, Scheurich saw a male run past him and jump over a residence wall.  He
10  called the 9-1-1 operator to report the incident.  An audiotape of that conversation
11  was played to the jury.  He made a tentative identification of petitioner from a
12  photographic lineup.

13       In the early morning hours of February 11, Carleen Nicholson heard a knock
14  on her door.  It was petitioner and his daughter.  Petitioner told her that he had
15  retrieved his daughter, but it "was bad."  She invited them in and went back to
16  sleep.  Petitioner and his daughter were sleeping on her sofa when she awoke.  By
17  8:30 a.m., petitioner was awake.  He appeared distraught.  A news report on
18  television named petitioner as the suspect in the shooting of a police officer.  At
19  Nicholson's urging, petitioner agreed to go with her to the nearby police station
20  after breakfast.  She fed petitioner and his daughter breakfast, but while she was in
21  the kitchen cleaning up the dishes, petitioner left.  Nicholson reported the matter
22  to the police.

23       A few days after the shooting incident, while playing with his dog in the
24  backyard, Murray's brother found the keys to Anjelique's Mustang in the

26       [7]  Officer Catanese, who was also in full uniform at the time of the shooting
27  incident, corroborated the testimony of Officer O'Gorman.

28

neighbor's backyard.  The Mustang was still parked in front of the house.  Within a few weeks after the shooting incident, Murray discovered bullets inside a peanut butter jar in his kitchen pantry.

Glendora Police Officer Daniel Antillon took part in the investigation.  He arrived at approximately 4:45 a.m. to collect evidence from the shooting scene.  Having been told Officer O'Gorman had fired a round into the Murray residence in the direction of the shooter, Officer Antillon found a .40 caliber round (consistent with all Glendora Police Officer duty guns) in the interior wall of the residence.  A .45 caliber semiautomatic handgun was found dangling from a string outside a bedroom window.  The magazine was empty, but there was a live round in the chamber.  Shell casings were found on the front lawn, front porch, and on the threshold of the front door, along with two live bullets just inside the front door and one just outside.  A firearms expert examined the .45 caliber semiautomatic handgun found at the residence.  The expert's analysis established that the casings found in and around the Murray residence had been fired from that handgun.  The expert also found the gun tended to misfire intermittently, causing it to jam.  A common way to remedy that malfunction would be to eject the chambered round, which would explain the presence of live bullets found in and around the home.

It was stipulated that a 14-year-old boy who had been in his backyard close to the Murray residence, in the early evening of May 8, 2006, found two ammunition magazines filled with .45 caliber rounds, next to two of petitioner's business cards, in an area behind a cement block.

*The March 3 Incident*

On March 3, 2006, Anjelique drove her Mustang to a shopping center and parked.  As she was getting out of her car, she saw petitioner parked in a brown car.  She immediately reentered her car and drove away down Lone Hill Avenue toward Arrow Highway, with petitioner speeding after her in the brown car and

1  shooting at her.  She was extremely frightened.  Bullets struck her back and arm

2  and she lost consciousness.  When she regained consciousness, Anjelique heard

3  petitioner say, "I love you, Anjelique," before driving away.  She received medical

4  treatment, but some of the injuries were inoperable and resulted in lasting harm.

5  Bullets remain in her arms, back, and head.  She could not move her left arm and

6  thumb.

7       At approximately noon on March 3, 2006, Deputy Sheriff Jesus Valenzuela

8  was driving to work.  It was raining as he pulled into the left turn lane on Lone

9  Hill Avenue at the intersection of Arrow Highway in San Dimas.  He saw

10  Anjelique's Mustang run the red light and crash into the curb on Arrow Highway.

11  Within seconds, a brown Chevrolet drove through the red light and stopped next to

12  the Mustang.  The deputy heard a gunshot, and the Mustang backed up and drove

13  southbound on Lone Hill, chased by the Chevrolet.  Anjelique's vehicle braked

14  and swerved erratically as she circled back to the intersection, before crashing into

15  the center median on Arrow Highway.  As the Chevrolet pulled alongside the

16  Mustang's driver side, Deputy Valenzuela heard approximately 15 gunshots being

17  fired before the Hispanic male in the Chevrolet drove away.  The deputy attempted

18  to follow in his own vehicle, but lost sight of the Chevrolet.  As he passed the

19  Mustang, he saw Anjelique sprawled across the passenger seat.

20       Pamela Cavanaugh was stopped at the same intersection. She too saw

21  Anjelique's Mustang being chased through the red light.  Cavanaugh heard

22  approximately four gunshots being fired as the Mustang tried to turn around and

23  get away from the pursuing Chevrolet.  It circled back around the intersection

24  twice, before the Mustang spun out of control and crashed into the center median.

25  Cavanaugh saw the Chevrolet stop next to it.  The male driver put his arm through

26  the Chevrolet's window and fired more than 17 shots at the driver of the Mustang

27  from a distance of less than five feet, before driving away.  Cavanaugh ran over to

28

9

Anjelique, who was slumped over the center console.  The side of the Mustang was riddled with bullet holes and Anjelique was bleeding and whispering, "please help me."

Two expended cases were found inside the Chevrolet.  Both were .45 caliber; both fired from the same weapon that fired all rounds found at the March 3 shooting scene.  There were 14 bullet impacts on the Mustang, all but one having been fired in the same direction – toward the driver side and moving across to the passenger side.

Sheriff's Deputy Timothy Ruggiero responded to the scene in his patrol car. He approached the white Mustang and saw Anjelique slumped over in her seat, ashen and bleeding from her neck and shoulder – apparently dead.  However, after repeated efforts to revive her, she became responsive.  The deputy asked who shot her and she repeated that it was her husband, "Frank Beltran."

With regard to the vehicle petitioner drove on March 3, the prosecution presented evidence that on the morning of February 27, 2006, Wilbur Gatson started up his 2002 light brown Chevrolet Cavalier, which was parked in front of his Pomona residence, and left it running while he went inside to get a jacket. When he returned, the car was gone. He reported it stolen.  When it was returned by the Sheriff's Department some months later, it had been wrecked – the front end having sustained damage.  Robert Cadena testified that in February 2006, he was informed his Chevrolet Cavalier might have been used in the commission of a crime.  When he checked the car's license plates, however, he discovered they had been taken and replaced with different ones.  A few nights before, when the car was parked in his driveway, his dog had been heard barking loudly at approximately 11:00 p.m.

**Defense Case**

Petitioner testified that on February 2, 2006, after he was released from custody, he spent the night in a motel with Anjelique and L.  Two days later, he accidently cut Anjelique with his knife.  They argued heatedly while he was driving.  When Anjelique struck his head with a knife, he grabbed it away and cut her in the process.  On February 8, Anjelique took L. and left petitioner.  Unable to find her, he filed a missing persons report on February 10.  Using the information on his mobile phone billing statement, he called various numbers trying to track her down.  A woman called back and told him that he needed to take his daughter away from Anjelique because she was "getting high in front of [L.]"  He and the woman agreed to arrange a meeting at a location in Pomona within walking distance from petitioner, who had no car.  He saw Anjelique park and approached her and the woman.  Anjelique fainted when she saw him. Petitioner shook her awake and angrily confronted her about "smoking dope" in front of their daughter.

Anjelique agreed to drive him to the house where L. was staying.  As petitioner moved a purse off the passenger seat, he saw drugs, baggies, and a scale fall out.  She denied they belonged to her.  Petitioner called Rivas and asked him to meet them to take L. to the home of petitioner's mother.  While Anjelique drove him to the Murray residence, petitioner relayed the directions to Rivas by cell phone.  She parked in front of the house and led him inside.  Rivas drove up.  Petitioner, who was not armed, went outside and pleaded with Rivas to take L. to her grandmother's home.  He went back inside, brought L. out, and put her in Rivas's car.

Anjelique appeared very intoxicated – "she was tweaking out of her mind, she couldn't make one intelligible sentence."  At no time did he pull a gun on

11

anyone.  Nor did he handcuff anyone.[8]   After a short respite, petitioner and Anjelique engaged in another "very heated" argument.  Hearing someone say, "the cops are outside," petitioner ran away, out through the backyard, to the next street over.  Having just recently been released from jail, he did not want to risk being charged with a domestic violence offense.  Petitioner stood on the street and called his mother to see if L. had arrived.  While on his cellular phone, he heard gunshots from the direction of the Murray residence.  As petitioner went back to the residence, a male he did not recognize (dressed, as petitioner was, in a black hooded sweatshirt) fired two gunshots in quick succession toward him. Petitioner fled through a backyard, through a field, and hid in a drain pipe.  He did not hide any .45 caliber magazines or business cards in the backyard where they were later found.

Petitioner emerged from the drain pipe and arranged to have L. dropped off to him at a hamburger place.  It was close to midnight.  Petitioner paid a young couple to drive them to Nicholson's house, where he and L. slept that night. The following morning, when he heard the television report that he was wanted by the police for shooting a police officer, petitioner became very nervous and broke down in tears, even though it was not true.  He left Nicholson's house and took a bus to Los Angeles.

Petitioner had nothing to do with the March 3, 2006 shooting incident on Arrow Highway.  He had a friend called "Biggie" who drove a large black sports utility vehicle, just like the one Anjelique had testified she saw in the parking lot before the shooting incident took place.

---

[8]   Inside the residence, investigating officers found handcuff links that appeared to have been "grinded off."  A "grinder" power tool was found on the kitchen counter. Calleros was handcuffed when the officers arrived.

**III.**

**PROCEEDINGS**

**A.      Proceedings in the State Courts**

On November 6, 2007, following a jury trial, petitioner was convicted of willful, deliberate, and premeditated attempted murder of a peace officer, specifically, Officer O'Gorman (count 1), willful, deliberate, and premeditated attempted murder of Anjelique (count 3), first degree burglary (count 5), three counts of assault with a firearm, on Anjelique, Calleros, and Murray (counts 7 through 9), three counts of false imprisonment by violence, of Anjelique, Calleros, and Murray (counts ten through twelve), and one count of assault on a peace officer (O'Gorman) with a semiautomatic firearm (count 13); and in addition, several firearm enhancements also were found true.  FAP at 2; Lodged Doc. 1 (Clerk's Transcript ("CT")) at 232-41, 317-18, 369-72.  On November 29, 2007, the trial court sentenced petitioner to eighty-six years to life in prison.  CT at 362-73.

Petitioner, represented by counsel, appealed his conviction.  Petitioner raised seven grounds for relief: (1) the trial court committed misconduct and violated his federal constitutional rights to a fair trial and to confront adverse witnesses when the court drew the jury's attention to petitioner's's non-testimonial conduct; (2) there was insufficient evidence petitioner knew or should have known Officer O'Gorman was a police officer; (3) there was insufficient evidence the shots fired at O'Gorman were premeditated; (4) there was insufficient evidence to support the conviction for assaulting Anjelique with a firearm; (5) the trial court abused its discretion in awarding restitution for Anjelique's victim relocation expenses; (6) the trial court violated his Sixth Amendment jury trial right by imposing the upper term sentences without a jury finding on the aggravating factors; and (7) the abstract of judgment must be corrected to eliminate reference

13

to a five-year prior conviction enhancement that was neither alleged nor proved. Lodged Doc. 4.[9]  On January 29, 2009, in a reasoned decision, the California Court of Appeal ordered that the abstract of judgment be modified to delete reference to an unspecified five-year enhancement; otherwise the judgment was affirmed.  Lodged Doc. 7.

Petitioner filed a petition for review in the California Supreme Court. Lodged Doc. 8.  Petitioner again presented grounds one through six raised in the Court of Appeal.  *Id.*   The California Supreme Court denied the petition for review without comment on April 15, 2009.  Lodged Doc. 11.

On February 23, 2010, petitioner filed a habeas petition in the Los Angeles County Superior Court, raising six grounds for relief: (1) the impaneling of Juror No. 10 was error; (2) false evidence was used to convict him; (3) he was denied his right to present a defense; (4) ineffective assistance of trial counsel; (5) prosecutorial misconduct for failing to disclose exculpatory evidence; and (6) the police purposely destroyed evidence of a motel video.  Lodged Doc. 12.  On March 24, 2010, the Superior Court denied petitioner's claims in a reasoned decision.  Lodged Doc. 13.

On May 25, 2010, petitioner filed a habeas petition in the California Court of Appeal.  Lodged Doc. 14.  In addition to the six grounds raised in the Superior Court, petitioner also argued that his trial counsel was ineffective at his sentencing hearing, and that his appellate counsel was ineffective.  *Id.*   The California Court of Appeal in a brief reasoned decision denied the habeas petition on June 7, 2010.

---

[9]   Although the copy of Appellant's Opening Brief lodged with the court is labeled Lodged Doc. 6, and the copy of Appellant's Reply Brief is labeled Lodged Doc. 4, these labels appear to be in error, as respondent's Notice of Lodgment lists the opening brief as Lodged Doc. 4 and the reply brief as Lodged Doc. 6. Accordingly, the court refers to these documents by their labels in the Notice of Lodgment.

1    Lodged Doc. 15.

2         Petitioner filed a habeas petition in the California Supreme Court on August

3    6, 2010.  Lodged Doc. 16.  Petitioner presented grounds two, four and five raised

4    in the Superior Court and California Court of Appeal on collateral review.  *Id.*

5    The California Supreme Court denied the habeas petition without comment on

6    March 30, 2011.  Lodged Doc. 17.

7    **B.    Proceedings in This Court**

8         On July 26, 2010 in this court, petitioner filed a Petition for Writ of Habeas

9    Corpus by a Person in State Custody.  The same day, petitioner also filed a Motion

10   for Stay and Abeyance.  On August 30, 2010, respondent filed an Opposition to

11   the Motion for Stay.  On October 22, 2010, this court granted petitioner's Motion

12   for Stay so that petitioner could attempt to exhaust his state court remedies as to

13   three of the grounds for relief raised in this court.  On May 2, 2011, petitioner filed

14   a request to reopen this case, as the California Supreme Court had denied his state

15   habeas petition on March 30, 2011; thus, all of his claims were fully exhausted.

16   On May 25, 2011, the court granted petitioner's request to reopen this case, and

17   ordered the stay and abeyance lifted.

18        With his request to reopen the case, petitioner filed, on May 2, 2011, his

19   First Amended Petition in this court.  The court deemed the FAP filed in its May

20   25, 2011 minute order.

21        Respondent filed a Return to the FAP on January 12, 2012 ("Answer").

22   Petitioner filed a Reply on January 11, 2013 ("Reply").

23                                    **IV.**

24                          **PETITIONER'S CLAIMS**

25   Petitioner raises six grounds for relief in the FAP:

26   1.    The trial court committed misconduct and violated his federal

27         constitutional rights to a fair trial and to confront adverse witnesses

28

                                      15

when the trial court drew the jury's attention to petitioner's non-testimonial actions;

2.     False evidence was used to convict him;

3.     Ineffective assistance of trial counsel based on:

    (a)    Failure to interview:

        (1)    Anthony Rivas and Maria Lopez regarding phone calls petitioner made to them;

        (2)    Witnesses regarding the sale of petitioner's guns;

        (3)    Witnesses to the March 3rd event; and

        (4)    March 3rd alibi witnesses;

    (b)    Failure to investigate:

        (1)    Inconsistencies in Officer O'Gorman's testimony;

        (2)    A radio transmission log;

        (3)    The location of a drain pipe; and

        (4)    Anjelique's medical records;

    (c)    Failure to question and challenge juror number ten;

    (d)    Conflict of interest; and

    (e)    Cumulative errors;

4.     Prosecutorial misconduct for failing to disclose exculpatory evidence;

5.     Insufficient evidence petitioner knew or should have known Officer O'Gorman was a peace officer; and

6.     Insufficient evidence petitioner shot at Officer O'Gorman with premeditation.

FAP at 5-6a; FAP Mem. at 18-76.[10]

---

[10]  "FAP Mem." refers to the typed Petition for Writ of Habeas Corpus that is one of the attachments to the form FAP.

16

# V.

## STANDARD OF REVIEW

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  AEDPA provides that federal habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

In assessing whether a state court "unreasonably applied" Supreme Court law or "unreasonably determined" the facts, the federal court looks to the last reasoned state court decision as the basis for the state court's justification.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991); *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).  Here, the California Court of Appeal's opinion on January 29, 2009 stands as the last reasoned decision on grounds one, five, and six.  As for the remaining grounds, the last reasoned (albeit somewhat cursory) decision is the Court of Appeal's June 7, 2010 decision; a more fully explicated decision on these grounds is the Superior Court's March 24, 2010 decision.  In addition, because grounds five and six are challenges to the sufficiency of the evidence, the court must conduct an independent review of the record.  *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).

# VI.

## DISCUSSION

**A.**   **Petitioner Is Not Entitled to Relief on His Judicial Misconduct Claim**

Petitioner alleges that the trial court committed misconduct when the trial court drew the jury's attention to petitioner's non-testimonial conduct.  FAP Mem. at 18.  For the background of this claim, the court draws verbatim from the California Court of Appeal's decision on direct appeal:

> Immediately after [petitioner's] testimony was completed, the trial court informed the jurors that it would conduct a short conference  with counsel outside their presence.  Before the jury was released, [petitioner] spoke out to "ask for a mistrial due to prosecutorial misconduct . . . and judicial misconduct."   The prosecutor objected and urged [petitioner] not to speak.  In the jury's presence, the court and [petitioner] engaged in the following colloquy:

> THE COURT:     Okay, we'll deal with your motion.

> [PETITIONER]:     My rights have been violated since I've been in this court.

> THE COURT:     All right. Well, let the jury go out, if you don't mind.

> [PETITIONER]:     And the judge has been denying all my motions for defense.

> THE COURT:     I assume that's for the jury's benefit.

> [PETITIONER]:     Thank you.

> After the jury left the courtroom, the trial court invited [petitioner] to make a statement.  [Petitioner] reiterated his claims of prosecutorial and judicial misconduct, and asked the court to grant a

18

1  mistrial.  He also asserted that he had a "conflict of interest" with his

2  counsel.  The court denied the mistrial motion and rejected

3  [petitioner's] subsequent argument that another judicial officer must

4  hear the motion. With some prompting from counsel, [petitioner] said

5  he was attempting to make a *Marsden* motion.  When the court asked

6  him the basis for any conflict with defense counsel, [petitioner]

7  responded in a vague and ambiguous manner.  The court found that

8  [petitioner] had "attempt[ed] to disrupt this trial in the presence of the

9  jury with a big grin on [petitioner's] face." [Petitioner] denied it, but

10  the court insisted [petitioner] had made the same facial expression to

11  the jury that he was currently making to the court.  It also found that

12  [petitioner] had been shouting when the jurors were trying to leave

13  the jury box.  The court stated that [petitioner] "knew that was

14  improper," but decided he "would do it [his] own way."

15      The conference continued outside the jury's presence, as the

16  trial court discussed procedural matters with counsel.  But when

17  [petitioner] interjected again, the court warned [petitioner] that if he

18  made further efforts to disrupt the trial in the jury's presence, "the

19  balance of the case will be conducted in [petitioner's] absence."  It

20  added: "So I'm asking you as politely as I know how, to remain silent

21  when the jury comes into the room. [¶] Do you understand me?"

22  [Petitioner] said he understood and promised to comply with that

23  direction.  After conducting a *Marsden* hearing, the trial resumed.

24      The trial court addressed the jury: "Ladies and gentlemen, I'd

25  like you to do the court a service, if you would. As the jury began

26  leaving the room, [petitioner] began shouting some complaints that he

27  had about his treatment and his constitutional rights, and thus and

28

1   such. I want you to disregard his comments.  They were not in
2   response to any questioning; they were simply his complaint and you
3   are to disregard them." An evidentiary matter was addressed and the
4   defense rested its case.  The court told the jury that trial would
5   recommence the following morning with jury instructions and
6   argument.

7        However, when the trial court directed a scheduling question to
8   the clerk, [petitioner] commented on the existence of an evidentiary
9   stipulation.  The court made the following statements to [petitioner],
10  which form the basis for [petitioner's] constitutional claims: *"Why*
11  *don't you do what I asked you, [petitioner], immediately before the*
12  *jury came in, which is please not disrupt the proceedings and please*
13  *remain silent, let your attorney speak. [¶] I asked you and you*
14  *promised me you would. Would you please keep your promise?"* The
15  record reflects that [petitioner] responded "in Latin."  The court
16  commented that as much as it "appreciat[ed] the Latin lesson," it
17  expected [petitioner] to refrain from speaking.  It again cautioned the
18  jury to disregard [petitioner's] comments, adding that *[petitioner] had*
19  *promised not speak out of turn, but [petitioner] "apparently intends*
20  *to do that from time to time."*  The court told the jury that [petitioner]
21  had been warned that he risked being excluded from the courtroom if
22  he persisted – and it repeated that warning to [petitioner] before
23  dismissing the jury for the evening.
24  Lodged Doc. 7 at 13-15 (emphasis added); *see also* Lodged Doc. 2 (Reporter's
25  Transcript ("RT")) at  at 583-90.
26      Petitioner argues that the trial court's italicized remarks above prejudiced
27  his rights and interests.  FAP Mem. at 21-22.  The California Court of Appeal
28

20

1   rejected petitioner's claim, finding that it failed on the "merits because the

2   challenged statements did not amount to evidence, but were a reasonable,

3   measured response to [petitioner's] own misconduct."[11]  Lodged Doc. 7 at 13.  The

4   court agrees.

5        "The Due Process Clause entitles a person to an impartial and disinterested

6   tribunal . . . ."  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S. Ct. 1610, 64 L.

7   Ed. 2d 182 (1980).  A trial court "must be ever mindful of the sensitive role it

8   plays in a jury trial and avoid even the appearance of advocacy or partiality."

9   *United States v. Harris*, 501 F.2d 1, 10 (9th Cir. 1974).  To succeed on a claim of

10  judicial bias, a petitioner must "overcome a presumption of honesty and integrity

11  in those serving as adjudicators."  *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S. Ct.

12  1456, 43 L. Ed. 2d 712 (1975).  Additionally, when a district court reviews a state

13  court judge's behavior on habeas review, the question is "whether the state trial

14  judge's behavior rendered the trial so fundamentally unfair as to violate federal

15  due process under the United States Constitution."  *Duckett v. Godinez*, 67 F.3d

16  734, 740 (9th Cir. 1995).

17       Here, the California Court of Appeal's rejection of this claim was not

18  contrary to Supreme Court precedent, as there is no evidence of judicial

19  misconduct rendering petitioner's trial "so fundamentally unfair as to violate

20  federal due process."  *See id.*  There is nothing to indicate that the trial judge

21

22  _____

    [11]    The Court of Appeal also applied a procedural bar to this claim finding that

23  petitioner forfeited the claim by failing to object below.  Lodged Doc. 7 at 13, 16-

    17.  Respondent argues this procedural bar should be applied here.  Answer at 31-

24  34.  But because the procedural bar issue is more complex, the court will resolve

25  this claim on its merits, which leads to the same result.  *See Franklin v. Johnson*,

    290 F.3d 1223, 1232 (9th Cir. 2002); *see also Lambrix v. Singletary*, 520 U.S.

26  518, 525, 117 S. Ct. 1517, 137 L. Ed. 2d 771 (1997) (a *Teague* issue may be

27  resolved before a procedural bar issue if the procedural bar "involved complicated

    issues of state law").

28

1  harbored any improper personal bias against petitioner, or otherwise favored the

2  prosecution.   On the contrary, as noted by the Court of Appeal, the record "makes

3  clear, it was [petitioner's] persistent disruptive behavior – after the trial courts'

4  unambiguous warnings – that invited the trial court's measured response."

5  Lodged Doc. 7 at 17; *see United States v. Laurins*, 857 F.2d 529, 537 (9th Cir.

6  1988) ("A federal judge has broad discretion in supervising trials."). Thus, the

7  court's pointed warning, including its reference to petitioner's promise not to

8  continue to disrupt the trial, does not display bias or partiality, but only a desire to

9  have a trial free of disruptions.

10       Moreover, this court concurs with the Court of Appeal's conclusion that the

11  trial court's instructions would have "dispelled any potential prejudice from what

12  [petitioner] mischaracterizes as judicial misconduct." Lodged Doc. 7 at 17.

13  The trial court instructed the jury that its "verdict must be based solely on

14  evidence, which it defined so as to exclude [petitioner's] nontestimonial

15  statements" and "not to take its cue from the judge." *Id.*; *see also* CT at 252, 304.

16  The court presumes that the jurors understood and followed these instructions, and

17  in reaching the verdict formed their own determination of the facts. *See Weeks v.*

18  *Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000) ("A jury is

19  presumed to follow its instructions.").

20       Finally, as noted by the Court of Appeal, in light of the "overwhelming

21  nature of the evidence against [petitioner] and the dubious nature of his own

22  testimony," any error was harmless. Lodged Doc. 7 at 28; *see Brecht v.*

23  *Abrahamson*, 507 U.S. 619, 638, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)

24  (habeas relief unavailable for trial-type error unless it "had substantial and

25  injurious effect or influence in determining the jury's verdict." (citation omitted)).

26  There was abundant evidence of petitioner's guilt. As to the February 10th

27  incident, evidence showed that petitioner forced Anjelique to take him to Murray's

28

22

home.  RT at 203-05, 291.  He then entered Murray's home with a gun in hand, and ordered occupants Murray and Calleros on the floor.  RT at 264-65, 292, 302. Petitioner handcuffed Anjelique and Calleros.  RT at 205, 264, 293.  He pointed his gun at Calleros's and Murray's heads while threatening them with death.  RT at 206, 265-67, 294, 296.  After learning that the police had arrived at the house, petitioner ushered the occupants to go out through the back door; however, Anjelique ran out the front door.  RT at 212, 213, 272, 298, 299, 540.  Despite knowing that the police were present in the front of the house, petitioner still followed Anjelique, where petitioner fired a shot at Officer O'Gorman at close range, then ran back in the house and fired more shots at the officer.  RT at 152-56, 284-85.  As to the March 3rd incident, evidence showed that petitioner chased after Anjelique in a stolen brown car.  During the car chase, petitioner shot at Anjelique multiple times, hitting her in the back and arm.  RT at 109-112, 121-23, 217-19, 495.

In sum, this claim does not merit habeas relief because the state appellate court's rejection of it was not contrary to, or an unreasonable application of, clearly established U.S. Supreme Court precedent, and any error committed by the trial judge was harmless in any event.

**B.    Petitioner Is Not Entitled to Relief on His False Evidence Claim**

Petitioner asserts that the prosecution used false evidence to convict him. FAP Mem. at 23-30.  Specifically, petitioner argues that portions of Officer O'Gorman's testimony were false because the testimony conflicted with other evidence in the record.  *Id.*

The Court of Appeal appears to have rejected this claim primarily on procedural grounds, but it fails on its merits in any event.[12]  The Superior Court

---

[12]   Here, both the Superior Court and Court of Appeal on collateral review applied a procedural bar to this claim, which respondent argues should be applied

1   also denied this claim, finding that petitioner "simply argues that since he believes

2   that certain physical evidence contradicts the recollections and observations of

3   various witnesses, that [] suggests that 'falsified evidence' must have been put

4   forth before the jury"; however, petitioner "fails to set forth facts remotely

5   suggesting that this is the case." Lodged Doc. 13. at 1-2. Although the Superior

6   Court's is not the last reasoned decision, the court agrees with this reasoning.

7         In a federal habeas action, relief is warranted if a petitioner can establish

8   that a prosecutor knowingly used false evidence to obtain the conviction. *Napue*

9   *v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *Hayes v.*

10  *Brown*, 399 F.3d 972, 978 (9th Cir. 2005). A *Napue* claim requires the petitioner

11  to show that "(1) the testimony (or evidence) was actually false, (2) the

12  prosecution knew or should have known that the testimony was actually false, and

13  (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d

14  886, 889 (9th Cir. 2003).

15        Petitioner argues that Officer O'Gorman's testimony that he was standing

16  south/east and approximately eight feet in front of the door when petitioner shot

17  him from just over the threshold is false because it is contradicted by the physical

18  evidence. Specifically, petitioner argues that Officer O'Gorman's testimony is

19  contradicted by the following evidence: (1) "blood trail begins about 2'-3' ft. just

20  south/east of the corner of the threshold, and [Officer O'Gorman's] flashlight was

21  located on the porch just south/west of the door," thus O'Gorman could not have

22  been 6-8 feet away from the door; (2) casings were found inside the house,

23  therefore the "shooter was actually inside the house when the shots were fired,"

24  not outside the house; and (3) the first round of bullets hit a wall in a south/west

25

26  here. Lodged Docs. 13, 15; Answer at 38-40. Again, because the procedural bar

27  issue is more complex, the court will resolve the issue on the merits, which leads

28  to the same result. *See Franklin*, 290 F.3d at 1232.

direction, not a south/east direction.  FAP Mem. at 26-28.

Petitioner's suggestions do not support his contention that Officer O'Gorman provided false testimony at petitioner's trial.   First, even assuming the physical evidence conclusively contradicted Officer O'Gorman's testimony, the fact that a witness gave inconsistent or conflicting testimony does not establish that such testimony was false. *United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997).   Rather, "[d]iscrepancies in testimony . . . could as easily flow from errors in recollection as from lies." *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995).

Next, even if petitioner could show that Officer O'Gorman perjured himself at trial, petitioner has not set forth any facts attributing knowledge of perjury to the prosecutor.  The mere fact that witnesses provided inconsistent accounts is insufficient to show prosecutorial knowledge. *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (finding that inconsistent testimony did not establish that the prosecution knew or should have known that such testimony was false); *United States v. Sherlock*, 962 F.2d 1349, 1364 (9th Cir. 1989) (holding that the argument that the prosecution presented witnesses with contradictory stories was insufficient to demonstrate knowledge of false testimony).

Finally, even assuming the prosecutor knowingly used false testimony, petitioner fails to show that he was prejudiced in any way, as this factual dispute about where Officer O'Gorman and the shooter were standing when Officer O'Gorman was shot and the trajectory of the bullet was presented at trial. *See Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that habeas petitioners must show "a reasonable probability that without all the perjury the result of the proceeding would have been different") (internal quotation marks and brackets omitted)).  While petitioner's counsel did not directly cross-examine Officer O'Gorman about the inconsistencies in his testimony as to where he was

standing, he did extensively address the inconsistencies in Officer O'Gorman's testimony in his closing argument.  RT at 730-33.  For example, petitioner's counsel specifically argued that Officer O'Gorman must have been "closer than his recollection" because "the physical evidence shows that contrary to Officer O'Gorman's recollection, that he was not eight feet from the door, but that he was actually about two feet from the door."  RT at 732-33.  Further, defense counsel argued that contrary to Officer O'Gorman's recollection, "the shooter was . . . further back in the building than actually standing in the threshold."  *Id.*  Thus, it was within the province of the jury to resolve the inconsistencies in Officer O'Gorman's testimony.  *See Geston*, 299 F.3d at 1135 ("At most, two conflicting versions of the incident were presented to the jury. It was within the province of the jury to resolve the disputed testimony."); *see also Murtishaw v. Woodford*, 255 F.3d 926, 959 (9th Cir. 2001) (holding that mere "inconsistency does not warrant a grant of the habeas petition").

In sum, petitioner has failed to demonstrate that the prosecution knowingly used false testimony, or that, even if the prosecution knowingly used false testimony, there is a reasonable probability that he would not have been convicted in the absence of the perjured testimony.  Accordingly, petitioner has failed to show that the state courts' denial of this claim was contrary to clearly established federal law or an unreasonable application of the law to the facts.

**C.**   **Petitioner Is Not Entitled to Relief on His Ineffective Assistance Claims**

Petitioner presents numerous ineffective assistance of counsel claims.  The court has grouped them as follows: (1) failure to interview witnesses; (2) failure to investigate; (3) failure to question Juror No. Ten; (4) conflict of interest; and (5) cumulative error.  These claims are without merit.

The Sixth Amendment guarantees a right to effective assistance of counsel.  *See Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674

(1984).  To establish an ineffective assistance of counsel claim, a petitioner must establish:  (1) counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms; and (2) the deficient performance prejudiced the defense.  *Id.* at 687.  "The inquiry under *Strickland*  is highly deferential and 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Greenway v. Schriro,* 653 F.3d 790, 802 (9th Cir. 2011) (quoting *Strickland*, 466 U.S. at 689); *see also Earp v. Cullen*, 623 F.3d 1065, 1074 (9th Cir. 2010).

Regarding the first prong, there is a "strong presumption that a counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.  As for the second prong, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.  *Id.* at 694; *Towery v. Schriro*, 641 F.3d 300, 315 (9th Cir. 2010).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Williams v. Taylor*, 529 U.S. 362, 391, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (quoting *Strickland*, 466 U.S. at 694).  The focus of the prejudice inquiry is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993).

### 1.    Failure to Interview Witnesses

Petitioner contends that his trial counsel was ineffective for failing to interview: (1) Anthony Rivas and Maria Lopez regarding calls petitioner made to them the night of the February 10th shooting; (2) witnesses regarding the sale of petitioner's guns; (3) witnesses regarding their observations of the March 3rd incident; and (4) March 3rd alibi witnesses.

The Court of Appeal rejected all of petitioner's ineffective assistance of

counsel claims, simply stating that petitioner "failed to meet his burden to show ineffective assistance of trial counsel." Lodged Doc. 15 at 1.  The Superior Court set forth its reasoning, stating it rejected most of petitioner's claims that trial counsel failed to interview certain witnesses – that is, all but subclaim one regarding Maria Lopez, which it rejected for other reasons – based on the following analysis:

> Petitioner claims that his attorney failed to interview certain individuals.  Petitioner fails to attach declarations from these individuals indicating whether this is true, and more importantly, he fails to attach declarations from these witnesses as to what, if anything, they could have added to the case.  Most mentioned by petitioner were, at most, tangentially involved in the matter, and there is simply no showing whatsoever that their testimony would have been relevant, mu[ch] less helpful to petitioner.  The mere fact that a person is listed somewhere in a police report does not mean that counsel has a duty to conduct a fact-to-face interview of the witness prior to trial.  In fact, this approach to trial preparation is highly unusual. [¶] Petitioner's bare allegations or belief that certain individuals might have been helpful witnesses is insufficient.

Lodged Doc. 13 at 2-3.  This court agrees.

"Counsel is not obligated to interview every witness personally in order to be adjudged to have performed effectively." *Lord v. Wood*, 184 F.3d 1083, 1095 n.8 (9th Cir. 1999) (citations omitted).  "A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel." *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986) (citation omitted).

1

2

     **a.**  **Failure to Interview Witnesses Regarding Phone Calls**

        **Petitioner Made to them During the February 10th Incident**

3  According to petitioner, at the time Officer O'Gorman was shot, petitioner

4 was blocks away and talking on his cell phone, first to his sister Maria Lopez and

5 then to Anthony Rivas.  FAP Mem. at 35; RT at 541-42.  Petitioner asserts that

6 despite knowing about these two phone calls, his trial counsel neither interviewed

7 Rivas or Lopez regarding the phone calls, nor used this evidence at trial to

8 corroborate and bolster petitioner's testimony.  FAP Mem. at 35-36.

9  Rivas testified on behalf of the prosecution, but in so doing corroborated

10 other parts of petitioner's testimony despite contrary testimony from other

11 witnesses.  *Compare* RT at 135-36, *with* RT at 205-06, 265, 264.  Petitioner's trial

12 counsel's cross-examination of Rivas indicates counsel was familiar with what

13 Rivas would say, whether or not counsel ever actually interviewed Rivas.  *See* RT

14 at 139-40.  In addition, petitioner did not submit a declaration from Rivas or from

15 trial counsel, and thus there is no basis for petitioner's claim that his trial counsel

16 failed to investigate Rivas.

17  Lopez declares that she was informed by petitioner's trial counsel that she

18 was going to be called as a defense witness, but he never questioned her "about

19 the specific information [she] would have provided regarding [the] phone call."

20 FAP Mem., Ex. D1.  As noted by the Superior Court, Lopez's declaration makes

21 "it clear that . . . trial counsel, Arthur Lindars did have pre-trial contact with Maria

22 Lopez."  Lodged Doc. 13 at 3; *see* FAP Mem., Exs. D1, D2.  Indeed, "[a]ccording

23 to Lopez's declaration, Mr. Lindars asked Ms. Lopez not to enter the courtroom

24 during trial because he believed he might call her to testify . . . i[f] this is the case,

25 Mr. Lindars was aware that she might have information useful to the defense."  *Id.*

26 Lopez states that counsel did not question her about the "details" of her call with

27 petitioner, but does not state whether he spoke with her at all about the phone call.

28

1   FAP Mem., Ex. D1.  Thus, petitioner's contention that trial counsel did not

2   investigate Lopez is not fully supported, although her declarations do raise

3   questions about the adequacy of counsel's investigation.  But this does not end the

4   inquiry under *Strickland*.

5       Petitioner attaches a declaration from Lopez stating that she would testify

6   about the phone call as petitioner claims.  *Id.*  As noted by the Superior Court,

7   however, "[a]ttorneys may have all manner of reasons not to call witnesses who

8   claim to have useful information, first and foremost being that often times they

9   simply do not believe the witness, and fear that a jury will come to the same

10  conclusion."  Lodged Doc. 13 at 4.  "Testimony as to the phone call, coming from

11  a person who is an obvious close associate of petitioner ([Lopez's] husband

12  apparently drove him away from the crime scene once he was a safe distance

13  away, according to the implication of the declaration) a jury is highly unlikely to

14  have given the testimony any weight whatsoever."  *Id.*  Indeed, petitioner also

15  testified Lopez is his sister.  RT at 541.  Thus, trial counsel may well have been

16  aware of the substance of Lopez's testimony, but simply opted not to call her.

17  Such a reasoned tactical choice does not constitute deficient performance.  *See*

18  *McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996) (finding no prejudice

19  from counsel's failure to call witnesses because impact of uncalled witness would

20  have been negligible due to their close relationship to defendant); *Bergman v.*

21  *Tansy*, 65 F.3d 1372, 1380 (7th Cir. 1995) (holding counsel was not ineffective for

22  failing to call family members who would easily have been impeached for bias).

23      Further, "[e]ven if it were absolutely true that the purported phone call

24  occurred, and occurred at a relevant time and place, it would prove nothing other

25  than that petitioner attempted to concoct an alibi of sorts as the events were

26  unfolding, or shortly thereafter."  Lodged Doc. 13 at 4.  As further explained by

27  the Superior Court:

28

30

1   The idea that another individual came upon the scene at the exact
2   moment petitioner was departing the crime scene, after having bound
3   and threatened the individuals in the home, and for unknown reasons
4   happened to shoot at a responding police officer and at petitioner, is
5   simply ridiculous in light of all the evidence adduced at trial.  The
6   fact that a friendly witness may have been willing to join in this
7   theory and attempt to bolster it does not alter that conclusion.  There
8   is simply no possibility that a reasonable jury would have credited
9   this defense version of the facts.

10  Lodged Doc. 13 at 4.  The court agrees.  Even if true that petitioner was on the
11  phone with either Lopez or Rivas, that fact does not establish that petitioner did
12  not shoot Officer O'Gorman.

13  In any event, the testimony of Anthony Rivas and Maria Lopez would have
14  been cumulative of evidence already presented to the jury.  *See Delgadillo v.*
15  *Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) (failure to elicit cumulative
16  testimony did not violate *Strickland*); *United States v. Schaflander*, 743 F.2d 714,
17  718 (9th Cir. 1984) (defense counsel not deficient for failing to present cumulative
18  evidence).  Here, trial counsel was able to elicit through petitioner's own
19  testimony that when Officer O'Gorman was shot, petitioner was blocks away and
20  on the phone with his sister, Lopez.  RT at 541-42.  Trial counsel also specifically
21  refers to petitioner's phone records indicating that petitioner made a phone call to
22  Maria Lopez at 10:53p.m. the night of the shooting.  RT at 542.  Thus, the
23  evidence was presented to the jury, and the jury rejected it.  Because Lopez's and
24  Rivas's testimony would not have created reasonable doubt as to petitioner's guilt,
25  petitioner's trial counsel was not ineffective for failing to present their testimony to
26  the jury.

27
28
                                        31

1
2

**b.**     **Failure to Interview Witnesses Regarding the Sale of**

**Petitioner's Gun**

3       Petitioner contends that trial counsel failed to interview Mary Beltran,

4 Maria Lopez, and Felix Borriega, who would have testified that they saw

5 Anjelique take petitioner's guns from his safe.  Petitioner argues that their

6 testimony would have shown that petitioner "could not have possessed the gun

7 used in the February 10 shooting, since [Anjelique] had taken it from his safe in

8 January" and sold it.  FAP Mem. at 39.

9       Petitioner's claim with respect to Felix Borriega fails at the outset.  There is

10 no declaration in the record from Borriega, so it is unknown what he would say.

11 *See Dows v. Wood*, 211 F.3d 480, 486 (9th Cir. 2000) (rejecting ineffective

12 assistance of counsel claim based on counsel's failure to interview or call alibi

13 witness, when petitioner provided "no evidence that this witness would have

14 provided helpful testimony for the defense *i.e.*, [he] has not presented an affidavit

15 from this alleged witness").

16       Although petitioner submitted declarations from Maria Lopez and Mary

17 Beltran regarding Anjelique taking guns out of petitioner's safe, neither Lopez nor

18 Beltran states that petitioner's trial counsel failed to interview her at all.  FAP

19 Mem., Exs. D2, D3.  Mary Beltran does not address the matter.  FAP Mem., Ex.

20 D3.  As discussed above, Maria Lopez states that, although she did have contact

21 with trial counsel and believed she would be called as a witness, trial counsel did

22 not talk to her before the trial "regarding information" she had.  FAP Mem., Ex.

23 D2.  She does not specifically state that trial counsel failed to interview her

24 regarding the gun.  *Id.*  Rather, she suggests this is the case, as Lopez indicates

25 that it was only after the trial that she saw a photo of the gun used in the shooting

26 and recognized it as a gun Anjelique offered to sell her a month before the

27 shooting.  *See id.*

28

32

Even if this is sufficient to establish that counsel failed to interview at least Lopez, petitioner has not established prejudice.  Both Maria Lopez and Mary Beltran indicate that they only realized after the trial, during petitioner's appeal, that the gun used in the February 10th shooting appeared to be one Anjelique took out of the safe to sell.  FAP Mem., Exs. D2, D3.  Thus, this information may well not have been revealed to counsel had he interviewed them.

Further, even had they testified consistent with their declarations, the value of such information to the defense would have been minimal.  Neither can conclusively state that Anjelique sold the gun used in the shooting.  Instead, they could testify only that they saw Anjelique remove a gun from petitioner's safe to sell that looked like the gun used in the shooting.  *Id.*  In light of the testimony from several witnesses that they saw petitioner with a gun at the house, the testimony of Maria Lopez and Mary Beltran would not have been sufficient to create reasonable doubt.  *See* RT at 205, 262-64, 291.

Moreover, such testimony would have been cumulative of evidence that was presented to the jury.  Petitioner testified that the gun used in the February 10th incident was his gun that he kept in his safe at his mother's house, and that Anjelique had the combination to the safe and had sold the gun to one of her friends.  RT at 537-38.  Calleros also testified that Anjelique had offered to sell her a gun.  RT at 223, 282-83.  Clearly this testimony did not sway the jury.

For all these reasons, even if counsel's performance was deficient, there is no reasonable probability that, had these witnesses testified, the outcome of the trial would have been different.

### c.     Failure to Interview Witnesses to the March 3rd Event

According to petitioner, there were more than thirty witnesses who made statements to the police regarding the March 3rd shooting.   FAP Mem. at 45-46; *see also* FAP Mem. Exs. L1-L13.  Petitioner contends that "almost all [these

witnesses] stated contradictory details compared to [Anjelique's] version of events," yet trial counsel failed to interview them.  FAP Mem. at 45.

First, once again there is no evidence that petitioner's trial counsel did not investigate the potential witnesses.  Petitioner only makes conclusory statements that his trial counsel failed to investigate.  Trial counsel may have interviewed each of the witnesses and concluded that their testimony would not have been helpful.  In addition, although petitioner notes that these witnesses would have contradicted parts of Anjelique's testimony, petitioner again fails to show that they were willing to testify and fails to provide declarations from such witnesses that they would have testified on his behalf.  *See Mack v. Sisto*, No. CV 09-1638-DSF (FMO), 2012 WL 3018205, at *13 (C.D. Cal. May 9, 2012) (ineffective assistance of counsel claim without merit when petitioner "has not presented any competent evidence demonstrating that [potential witness] was available and willing to testify," such as affidavit or declaration), *accepted by* 2012 WL 3018159 (C.D. Cal. July 23, 2012).

Even assuming that they would have testified as petitioner claims, petitioner has not shown their testimony would have created reasonable doubt.  Specifically, petitioner argues that of the thirty plus witnesses who observed the March 3rd shooting: (1) no one but Anjelique mentioned that a black truck was involved in the chase; (2) no one but Anjelique heard someone yell "I love you Anjelique"; (3) all but one witness described the gun used as a handgun, not a 16- or 18-inch fully automatic gun as described by Anjelique; and (4) the other witnesses said the gunman was wearing a mask, while Anjelique testified that "she saw her husband looking through a scope."  FAP Mem. at 46.  But although these witnesses allegedly would not have corroborated Anjelique's testimony in these respects, they also would not have materially undermined her testimony.  For example, the fact that some (although not all) of the witnesses described the shooter's face as

covered with a cloth or bandana at the time of the shooting (*see* FAP Mem. Exs. L1-L13) is not necessarily inconsistent with the evidence that – before the car chase and shooting even began – Anjelique unequivocally identified petitioner as the driver of the brown car, and then as the person who shot her multiple times. RT at 217-19, 495.  Thus, there is no reason to find that trial counsel's decision not to interview these witnesses had any effect on the outcome of the case.

### d.   Failure to Interview Alibi Witnesses

Petitioner contends that he informed trial counsel that he was at the apartment of Mr. and Mrs. Martin Woods during the time of the March 3rd incident.  Petitioner states he did not know their address, but that he had Mr. Woods's grandparents' address and yet trial counsel failed to hire an investigator to locate these witnesses.  FAP Mem. at 49-51.

Petitioner's claim fails for the same reasons as his other ineffective assistance claims.  First, petitioner has not shown his attorney did not try to contact these witnesses.  Indeed, even petitioner's unsupported account is ambiguous on this point.  Second, petitioner fails to provide a declaration from Mr. or Mrs. Woods that they would have testified on petitioner's behalf.  Third, petitioner has not shown that they would have given testimony beneficial to petitioner.  And fourth, unlike other cases where courts have found ineffective assistance of counsel due to an attorney's failure to interview and subpoena alibi witnesses (*see, e.g., Luna v. Cambra*, 306 F.3d 954 (9th Cir. 2002)), the case against petitioner for the March 3rd shooting was strongly supported by the record.  As discussed above, Anjelique unequivocally identified petitioner as the shooter.  Consequently, in weighing the strong evidence implicating petitioner against the proposed alibi testimony that purportedly only discussed petitioner's whereabouts at the times the crimes occurred in general and conclusory terms, petitioner has failed to show that there is a "reasonable probability that, but for

counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

### 2. Failure to Investigate

Petitioner asserts several ineffective assistance of counsel claims based on trial counsel's failure to investigate. "[C]ounsel has a duty to make reasonable investigations" and "a particular decision not to investigate must be directly assessed for reasonableness." *Strickland*, 466 U.S. at 691.

Again, the Court of Appeal simply found petitioner failed to meet his burden to show ineffective assistance of trial counsel. Lodged Doc. 15 at 1. The Superior Court noted that it did not deal with all these claims "separately, for the same analysis applies to all of them." Lodged Doc. 13 at 2. Specifically, it found that "petitioner simply lists dozens of bare conclusory allegations about his trial counsel, and offers no declaration of counsel, or anyone else, that would tend to demonstrate the truth of the allegations, and petitioner fails to provide any justification whatsoever for his failure to do so." *Id.* This court agrees.

### a. Failure to Investigate the Inconsistencies in Officer O'Gorman's Testimony

Petitioner contends his trial counsel failed to investigate the physical evidence at the scene of the February 10th shooting, and thus failed to exploit inconsistencies in Officer O'Gorman's testimony, such as during cross-examination of the prosecution's firearms expert. FAP Mem. at 31-34. Petitioner argues that trial counsel should have retained a defense expert to "examine the evidence and confirm and develop a scenario to explain how the discordant evidence would show that O'Gorman's testimony was not plausible." FAP Mem. at 31.

It is not necessary to call an expert in every instance. *See Duncan v. Ornoski*, 528 F.3d 1222, 1235 (9th Cir. 2008). "[W]hen the prosecutor's expert witness testifies about pivotal evidence or directly contradicts the defense theory, defense counsel's failure to present expert testimony on that matter may constitute deficient performance." *Id.* But as noted by the Superior Court, petitioner here has failed to "demonstrate that an expert on 'crime scene investigation' could have added anything meaningful to the evidence adduced at trial." Lodged Doc. 13 at 2. Petitioner's primary defense was that he was not the shooter (RT at 728); thus, where Officer O'Gorman was standing when he was shot was irrelevant to petitioner's defense.

Petitioner's counsel argued in the alternative that the evidence was insufficient to show that the shooter intended to kill Officer O'Gorman or knew he was a police officer. RT at 732-33. And trial counsel did use the physical evidence to advance these alternative arguments. As discussed above in Section VI.B *supra*, petitioner's trial counsel extensively argued in closing argument the inconsistencies between Officer O'Gorman's testimony and the physical evidence of where Officer O'Gorman was standing when he was shot. RT at 730-33. Thus, while trial counsel did not directly cross-examine the prosecution expert about the alleged inconsistencies in Officer O'Gorman's testimony, trial counsel specifically addressed the inconsistences in closing argument. *See Range v. Schomig*, 351 Fed. Appx. 222, 223 (9th Cir. 2009) (rejecting claim of inefficient assistance based on failure to cross-examine victim regarding inconsistent statements where counsel otherwise "thoroughly developed" the inconsistencies in examination of other witnesses and in closing argument). Further, as noted by the Superior Court, there is no basis in the record to conclude that if trial counsel had emphasized the inconsistencies on cross-examination of Officer O'Gorman, a more favorable outcome would have occurred, particularly in light of the other evidence against

37

1    petitioner.  *See* Lodged Doc. 13 at 3.

2           **b.     Failure to Investigate a Radio Transmission Log**

3           According to petitioner, "when Officer Catanese . . . saw and heard the shot

4    that hit Officer O'Gorman, she radioed in a 'shots fired' call."  FAP Mem. at 36.

5    The radio transmission log reflected that Officer Catanese's call was made at

6    10:53 p.m., the same time petitioner made his call to Maria Lopez.  *Id.*  Petitioner

7    claims that this evidence would have corroborated his testimony that he was on his

8    cell phone when Officer O'Gorman was shot, and therefore he could not have shot

9    Officer O'Gorman.  FAP Mem. at 37.

10          Here, petitioner testified that he was on the phone with his sister, Mary

11   Lopez, at the same time Officer O'Gorman was shot.  RT at 541-42.  Trial counsel

12   also presented petitioner's phone records indicating the time of the phone call,

13   10:53 p.m.  RT at 542; *see* FAP Mem., Ex. G1.  The radio transmission log shows

14   a call made by Officer Catanese that shots were fired at 10:53:39 p.m.  FAP Mem.,

15   Ex. G2.  As it appears no evidence was introduced at trial showing precisely when

16   Officer Catanese called in that shots were fired, the court agrees with petitioner

17   that the radio transmission log would have aided in his purported alibi defense that

18   he was speaking with Lopez when shots were fired.

19          But assuming, without deciding, that trial counsel performed deficiently in

20   not introducing the radio log, petitioner has failed to show the absence of the log

21   prejudiced him.  The police radio log and petitioner's Cingular cell phone use

22   report were not time synced.  Even assuming their clocks were very close to in

23   sync, at best with the admission of the radio log there would have been evidence

24   that petitioner called Lopez within a minute of Officer Catanese radioing that

25   shots had been fired.  This timing would allow for petitioner to have shot at

26   Officer O'Gorman, run out the back of the house, and then quickly called Lopez to

27   "attempt[] to concoct an alibi of sorts as the events were unfolding, or shortly

28

thereafter." *See* Lodged Doc. 13 at 4.

Petitioner argues the prejudice caused by the absent radio log evidence is demonstrated by the fact that the jury asked for the time stamps for the 9-1-1 transcripts during deliberations. FAP Mem. at 37. But Officer Catanese did not radio "shots fired" via a 9-1-1 call. The jury in fact was asking for time stamps for Anjelique's 9-1-1 call placed well before the shooting. RT at 760-61. There is no indication the jury was focused on the time Officer Catanese radioed that shots had been fired.

In sum, the state courts reasonably concluded that introduction of the radio transmission log would not have resulted in a different verdict. *See Strickland*, 466 U.S. at 694. As such, they reasonably rejected this claim.

### c.     Failure to Investigate Drain Pipe Location

According to petitioner, after leaving the Murray residence, he crawled through a drain pipe, came out on the other side and made several more phone calls as he walked east. FAP Mem. at 40. He argues that trial counsel should have gone to the "location to see if in fact, the details petitioner described were accurate, then taken photos [of the location] to corroborate petitioner's testimony" to "show that petitioner was actually there." FAP Mem. at 40-41. But the court agrees with the Superior Court that:

> petitioner's complaint that his attorney failed to put on evidence to corroborate the fact that a drain pipe exists at the location petitioner claims to have hidden in a drain pipe misses the point. Whether petitioner hid in this precise drain pipe or not is irrelevant – both sides agree that petitioner fled from the scene. Since it was obvious that petitioner attempted to pattern his testimony around known landmarks and upon the known physical evidence, it is hardly surprising that there would be a drain pipe present where petitioner

1        claims to have hidden in a drainpipe.  That "evidence" would have

2        corroborated nothing.  His route was minimally relevant, at best.  The

3        dispute is not in the details of his flight path, but rather his activities

4        before fleeing.

5  Lodged Doc. 13 at 5.  Thus, there is no reasonable probability that the outcome of

6  the trial would have been different if trial counsel presented evidence

7  corroborating where petitioner hid after the shooting, as this was irrelevant to

8  petitioner's guilt.  *See Strickland*, 466 U.S. at 694.

9                **d.**    **Failure to Investigate Anjelique's Medical Records**

10        Petitioner next contends that trial counsel was ineffective for failing to

11  obtain and use Anjelique's medical records to determine whether she had

12  methamphetamine in her system during the March 3rd incident because it would

13  have proven that her ability to perceive and recall the events of that day was

14  impaired.  FAP Mem. at 46-47.

15        First, petitioner cannot obtain habeas relief based on mere speculation

16  regarding the contents of Anjelique's medical records.  *See Santos v. Maddock*,

17  2006 WL 1686091, *17 (E.D. Cal. June 16, 2006), *adopted by* 2006 WL 2131125

18  (E.D. Cal. July 27, 2006) (rejecting ineffective assistance claim based on failure to

19  obtain victim's medical records because "speculation as to what the medical

20  records might contain is insufficient to establish the prejudice prong of his claim

21  of ineffective assistance of counsel").  Further, it appears from the record that trial

22  counsel did investigate Anjelique's medical records, as trial counsel reported to

23  appellate counsel that there were no records for "any screening for the kinds of

24  drugs that would be relevant to whether [Anjelique] was under the influence when

25  she was shot . . . ."  *See* FAP Mem., Ex. N4.

26        Even assuming that trial counsel performed deficiently by failing to obtain

27  the medical records, petitioner has not shown a reasonable probability that the

28

result of the proceeding would have been different if he had done so. *See Strickland*, 466 U.S. at 694.   As noted by the Superior Court, if a person is under the influence of methamphetamine that "does not mean that a person is necessarily, or even usually, unable to discern reality . . . ." Lodged Doc. 13 at 5. Indeed, the evidence does not support petitioner's claim that Anjelique was suffering from impaired perceptions to a degree that her ability to perceive events was undermined.  Anjelique's recollection of the event was substantially confirmed by several other witnesses. *Compare* RT at 217-19, *with* RT at 108, 120-22, 366-67.  Petitioner has thus shown neither defective performance nor prejudice.

### 3.   Failure to Question and Challenge Juror Number Ten

Petitioner contends trial counsel was ineffective for failing to question Juror No. 10 regarding his involvement with law enforcement or the district attorney's office. FAP Mem. at 53-54.  This claim does not merit habeas relief.

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).  "If only one juror is unduly biased or prejudiced or improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

"[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).  Rather, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*  Thus, when allegations of juror misconduct or bias arise, the trial court must determine the circumstances, the

1   impact on the jurors, and whether the conduct was prejudicial.  *Remmer v. United*

2   *States*, 347 U.S. 227, 229-30, 74 S. Ct. 450, 98 L. Ed. 654 (1954).  There must be

3   a showing of actual or implied bias to disqualify a juror.  *United States v.*

4   *Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000).

5       During trial, it was discovered that Juror No. 10 was a probation officer for

6   one of the prosecution's witnesses, Louie Acosta.  As a result, the trial court

7   inquired into the juror's potential conflict as follows:

8   [The Court]:         . . . Sir, we've looked into the issue that you

9                        brought up the other day having to do with your

10                       possible knowledge of a witness Louie Acosta.

11                       We had Mr. Acosta come in and I spoke to Mr.

12                       Acosta.  You are correct, it is the same gentleman,

13                       no doubt about it.  He's on probation as you know,

14                       on a straight possession case dating back to '06.

15  [Juror No. 10]:     Yes, sir.

16  [The Court]:        I think that arrest was probably sometime in

17                      March or thereafter. [¶]  In any event, he will

18                      probably be testifying here as a witness and be

19                      questioned by the attorneys.  [¶] Do you believe

20                      that your knowledge of Mr. Acosta gleaned

21                      through your contact with him as a probation

22                      officer would make it difficult for you to be an

23                      objective judge of his credibility in any way, or

24                      not?

25  [Juror No. 10]:     No, sir, would have nothing to do with it.

26  [The Court]:        Do you think you could treat his testimony and

27                      judge the weight to be given to his testimony by

28

42

| | | |
|---|---|---|
| 1 | | applying the same standards you would to |
| 2 | | anybody else's testimony? |
| 3 | [Juror No. 10]: | Yes, sir. |
| 4 | | * * * |
| 5 | [The Court]: | - - Do you now much about him at all? |
| 6 | [Juror No. 10]: | No, sir.  I know very little about him. |
| 7 | [The Court]: | Okay.  [¶] People I will allow you to inquire if you |
| 8 | | wish. |

RT at 254-56.

The prosecution proceeded to ask Juror No. 10 additional questions; defense counsel did not ask any questions.  RT at 256-57.  The trial court then admonished Juror No. 10 to "[m]ake sure that you are using the same exact evidence that all the other jurors are using.  In other words, that evidence and reasonable inferences to be drawn therefrom from the evidence received right here in the courtroom." *Id.*  Neither the prosecution nor defense counsel moved to remove Juror No. 10. *Id.*  Thus, the trial court allowed Juror No. 10 to remain on the jury.  RT at 257-58.

As noted, the Court of Appeal summed up its rejection of the ineffective assistance claims by finding petitioner failed to meet his burden.  Lodged Doc. 15 at 1.  The Superior Court rejected petitioner's claim that trial counsel was ineffective for failing to question Juror No. 10 because "[d]efense counsel apparently believed that juror #10 would be a favorable defense juror, and chose to make no motion to have the juror removed despite his arguable tangential knowledge about one of the trial witnesses. " Lodged Doc. 13 at 1.  Thus, it was a "reasonable tactical choice." *Id.*  Further, the court noted that "even assuming that counsel had objected, there is no reasonable possibility that a result more favorable to [petitioner] would have occurred," particularly as juror number ten

43

1  "had no knowledge of the facts of the case, and was shown to be of a state of mind
2  to properly and fairly decide the cause."  *Id.*  The court agrees.

3      Here, Juror No. 10 was asked whether he could judge witness Acosta's
4  testimony impartially, and he indicated that he could judge his testimony the same
5  as anyone else's.  RT at 255.  He also stated he would be fair and impartial.  RT at
6  256.  The record is also devoid of any evidence that Juror No. 10 had a more
7  substantial knowledge of the witness than he indicated to the court.  Thus, in the
8  absence of even an appearance of bias on the part of Juror No. 10 during
9  questioning, counsel cannot be faulted for relying on Juror No. 10's sworn
10  statements that his knowledge of witness Acosta would not affect his impartiality.
11  *See Wilson v. Henry*, 185 F.3d 986, 991 (9th Cir. 1999) (no ineffective assistance
12  of counsel where counsel relied on jurors' statements that they would be fair and
13  follow the law without asking about their views on defendant's criminal history).
14  This record is simply insufficient to overcome the strong presumption that
15  counsel's conduct fell within the "wide range" of reasonable professional
16  assistance.  *See Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007).

17      **4.    Conflict of Interest**

18      Petitioner argues that he was denied effective assistance of counsel due to
19  the trial court's denial of his request for substitute counsel to represent him in a
20  motion for a new trial.  FAP Mem. at 55-60.  Petitioner's motion was premised on
21  the alleged ineffectiveness of his trial counsel, whom he argues could not properly
22  present such a claim due to an "actual conflict."  *Id.*

23      As an initial matter, the Ninth Circuit has found that there is no clearly
24  established Supreme Court decision requiring a state trial court to appoint
25  substitute counsel when a petitioner's motion for a new trial will be premised on
26  the alleged ineffective assistance of his trial counsel.  *See Jackson v. Ylst*, 921 F.2d
27  882, 888 (9th Cir. 1990) (finding that such a contention is unsupported by existing

28

case law and declining to adopt a rule requiring the automatic substitution of

counsel whenever a new trial motion is premised on trial counsel's ineffectiveness,

because such a requirement would be barred under the anti-retroactivity

proscription of *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334

(1989)).  Thus, petitioner's argument necessarily fails under 28 U.S.C.

§ 2254(d)(1) because, as it is unsupported by any Supreme Court precedent, the

state court's decision does not contravene any clearly established federal law.  *See*

*Jackson*, 921 F.2d at 888.  A state court's decision adjudicating an issue cannot be

contrary to, or an unreasonable application of, Supreme Court precedent if the

Supreme Court has not decided the issue.  *Wright v. Van Patten*, 552 U.S. 120,

125, 128 S. Ct. 743, 746-47, 169 L. Ed. 2d 583 (2008); *Carey v. Musladin*, 549

U.S. 70, 77, 127 S. Ct. 649, 654, 166 L. Ed. 2d 482 (2006).

        In any event, the trial court gave petitioner the opportunity to explain his

reasons for wanting substitute counsel for the purposes of investigating the need

for a motion for a new trial based upon his trial counsel's incompetence.  RT at

815-29.  The trial court then determined that petitioner's request was not based on

a "good faith legal argument, but [wa]s based on his desire to delay."  RT at 827.

Specifically it noted:

> based upon my observation of counsel's performance during the trial,
>
> based upon the repetitive *Marsden* motions, which are utterly without
>
> merit.  There's not a suggestion of a hint of attorney incompetence.
>
> Nonetheless, the court has allowed [petitioner] to make the argument
>
> to the court and the motion for the new trial has been made verbally.
>
> It will be denied because there's absolutely no grounds shown for the
>
> motion.

RT at 827.  Thus, the trial court made an appropriate inquiry and reasonably

concluded that discharging trial counsel and replacing him with a new attorney

1    was not appropriate.  *See Larson v. Palmateer*, 515 F.3d 1057, 1066-67 (9th Cir.

2    2008) (finding no Sixth Amendment violation in the denial of petitioner's motion

3    for substitute counsel when, as here, petitioner did not establish any conflict but

4    rather "complained solely about his counsel's strategic decisions and lack of

5    communication with him," including counsel's failure to make the motions

6    petitioner requested and obtain petitioner's approval of potential witnesses).

7        Further, it appears from the record that petitioner's stated bases for having

8    his counsel replaced boiled down to disagreements over tactical choices, and thus

9    presented allegations of ineffectiveness rather than irreconcilable conflict.  RT at

10   823.  The dispute "arose over decisions that are committed to the judgment of the

11   attorney and not the client" and did not constitute a "conflict" requiring the grant

12   of petitioner's request for substitute counsel.  *Schell v. Witek*, 218 F.3d 1017, 1026

13   & n.8 (9th Cir. 2000) (observing that a dispute between attorney and client over a

14   tactical decision would not implicate the Sixth Amendment; and citing *Brookhart*

15   *v. Janis*, 384 U.S. 1, 8, 86 S. Ct. 1245, 16 L. Ed. 2d 314 (1966) (concurring

16   opinion), for the proposition that "a lawyer may properly make a tactical

17   determination of how to run a trial even in the face of his client's incomprehension

18   or even explicit disapproval").  Thus, there was no conflict that denied petitioner

19   effective assistance of counsel.

20        **5.    Cumulative Error**

21        Petitioner contends that the cumulative effect of trial counsel's errors as

22   discussed in Sections VI.C.1 through VI.C.4 *supra*, had a "substantial influence"

23   over the verdict, and deprived him of his due process rights and a fair trial.  FAP

24   Mem. at 61-65.  There is no merit to this claim.

25        To obtain relief under a theory of cumulative error, a habeas petitioner must

26   show that "although no single trial error examined in isolation is sufficiently

27   prejudicial to warrant reversal, the cumulative effect of multiple errors" prejudiced

28

his trial.  *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) (internal quotation marks omitted).  As the Ninth Circuit has explained:

> In cases where there are a number of errors at trial, a balkanized, issue-by-issue harmless error review is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant.  In other words, errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.  In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors.

*Alcala v. Woodford*, 334 F.3d 862, 883 (9th Cir. 2003) (internal quotation marks and citations omitted).  But where a petitioner fails to demonstrate any constitutional error by the trial court, the "cumulative error" analysis is inapplicable.  *See United States v. Martinez-Martinez*, 369 F.3d 1076, 1090 (9th Cir. 2004).

As discussed above, petitioner has not established any violation of his constitutional rights.  "Because there is no single constitutional error in this case, there is nothing to accumulate to a level of a constitutional violation." *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).  Moreover, as set forth above, the evidence of petitioner's guilt was overwhelming.  Petitioner has not established that the state court's determination that cumulative error did not render his trial unfair "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

To the errors claimed separately by petitioner and discussed above, in the cumulative error section of the FAP petitioner adds one more claimed error, that

his counsel rendered ineffective assistance during closing argument by "essentially admitt[ing] guilt for the 2/10/06 shooting." *See* FAP Mem. at 62-64. "The right to effective assistance extends to closing arguments." *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003). "Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Id.* at 5-6. "Judicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas." *Id.* at 6.

Under this demanding standard, petitioner's claim attacking trial counsel's argument fails. Counsel's challenged statements, even if they could properly be characterized as concessions, did not constitute deficient performance. *See Hovey v. Ayers*, 458 F.3d 892, 906 (9th Cir. 2006) (rejecting argument that counsel for defendant charged with first degree murder performed deficiently by arguing, "I submit to you that it's within the realm that there could be findings . . . of willful, deliberate and premeditated . . . yet . . . there may be some reasonable doubt."); *see also, generally*, *United States v. Swanson*, 943 F.2d 1070, 1075-76 (9th Cir. 1991) ("in some cases a trial attorney may find it advantageous to his client's interests to concede certain elements of an offense or his guilt of one of several charges"); *Yarborough*, 50 U.S. at 9 (calling client a "bad person, lousy drug addict, stinking thief, jail bird" not ineffective assistance of counsel because "[b]y candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case"). At no point did counsel here recommend that the jury find petitioner guilty. At no point did counsel suggest the prosecution had met its burden of proving him guilty beyond a reasonable doubt. To the contrary, the challenged statements were part of a larger

1  attempt to expose the deficiencies in the prosecution's case and demonstrate the

2  applicable standard of proof was not met.  Counsel's argument thus fell within the

3  broad range of competent representation.  Thus, once again, petitioner has not

4  shown ineffective assistance that could accumulate with other instances of

5  deficient representation to together constitute a constitutional violation.

6        In sum, the court concludes that the state courts' denial of petitioner's

7  various ineffective assistance of counsel claims, separately and cumulatively, was

8  not contrary to and did not involve an unreasonable application of clearly

9  established federal law as determined by the United States Supreme Court, nor

10  was it an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d).

11  Accordingly, petitioner is not entitled to habeas relief on these claims.

12  **D.    Petitioner Is Not Entitled to Habeas Relief on His *Brady* Claim**

13        Petitioner "motioned the court to compel the prosecution to provide a copy

14  of a fingerprint found on a license plate on the car used in the March 3rd

15  shooting." FAP Mem. at 66.  The trial court ordered the prosecution to provide a

16  copy of the print.  *Id.*  Petitioner asserts that the print provided by the prosecution

17  was not the print he requested.  *Id.*  Petitioner argues that if the correct print were

18  provided, it would have led to the suspect who actually stole the car used in the

19  March 3rd shooting.  FAP Mem. at 67.  This claim does not warrant federal habeas

20  relief.

21        The prosecution's failure to disclose material evidence favorable to the

22  defense violates due process regardless of the prosecution's good or bad faith.

23  *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

24  Evidence is "material" under *Brady* "only if there is a reasonable probability that,

25  had the evidence been disclosed to the defense, the result of the proceeding would

26  have been different."  *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375,

27

28

1  87 L. Ed. 2d 481 (1985).  Here, "reasonable probability" means "a probability

2  sufficient to undermine confidence in the outcome."  *Id.*

3      First, even assuming that petitioner was not in fact given the "correct" print,

4  the record reflects that had he been given the "correct" print it would not have

5  been exculpatory because the print lifted from the license plate was not a "usable

6  print" as it was of insufficient quality for a comparison.   RT at A21.  Speculation

7  that withheld evidence might possibly have been exculpatory does not suffice to

8  establish a *Brady* violation.  *See, e.g., Phillips v. Woodford*, 267 F.3d 966, 987

9  (9th Cir. 2001) (rejecting *Brady* claim where petitioner failed to prove that a report

10  existed or that it would have contained exculpatory evidence); *Downs v. Hoyt*, 232

11  F.3d 1031, 1037 (9th Cir. 2000) (rejecting *Brady* claim as too speculative).

12      Further, as noted by the Superior Court, "whether there was or was not a

13  fingerprint on the license plate of the stolen car is not terribly relevant – certainly

14  it would be expected that the fingerprint of the car's owner might well be on the

15  plate." Lodged Doc. 13 at 6.  "The fact th[at] some unknown person's print is

16  found on a license plate would in no way demonstrate that petitioner did not steal

17  the car or plate, and certainly would not demonstrate that he was not the driver of

18  the car." *Id.*  Finally, it does nothing to undermine the statement provided by

19  Anjelique, who told police soon after the shooting that petitioner was the driver of

20  the stolen brown car and had shot her several times. *Id.*; RT at 217-19, 495.

21  Based on the foregoing, evidence that petitioner's fingerprints were not found on

22  the license plate would not have resulted in a different verdict.  For the same

23  reason, petitioner's argument that trial counsel was ineffective in not pursuing the

24  "correct" print fails.

25      In sum, there is no basis for finding that the state courts' rejection of

26  petitioner's claim was contrary to, or an unreasonable application of, clearly

27

28

established federal law, or based on an unreasonable determination of the facts.

Thus, this claim does not merit habeas relief.

**E.   Petitioner Is Not Entitled to Relief on His Sufficiency of the Evidence Claims**

As to petitioner's convictions for premeditated attempted murder of a peace officer and assault with a firearm on a peace officer, petitioner asserts that there was insufficient evidence to prove that petitioner knew or should have known Officer O'Gorman was a police officer engaged in the performance of his duties, and that the attempted murder was premeditated.  FAP Mem. at 71-76. Petitioner's claims are without merit.

In *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), the United States Supreme Court held that federal habeas corpus relief is not available to a petitioner who claims that the evidence was insufficient to support his conviction unless he can show that, viewing the record in a light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  In evaluating such claims, the court must presume, even if it does not affirmatively appear in the record, that the jury resolved any conflicting inferences in favor of the prosecution. *Wright v. West*, 505 U.S. 277, 296-97, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992) (citing *Jackson*, 443 U.S. at 326).  The court reviews the state court's decision "with an additional layer of deference," granting relief only when the state court's judgment was contrary to, or an unreasonable application of, the *Jackson* standard. *Juan H. v. Allen*, 408 F.3d 1262, 1274-75 (9th Cir. 2005); *see also Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011) (the AEDPA and *Jackson* standard pose a "double dose of deference that can rarely be surmounted" ).  Finally, the court will not re-weigh evidence, reassess witness credibility, or resolve evidentiary conflicts on habeas review; that is the province of the jury. *See Bruce v. Terhune*, 376 F.3d

950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference under *Jackson*.") (citing *Schlup v. Delo*, 513 U.S. 298, 330, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)); *Walters v. Maass,* 45 F.3d 1355, 1358 (9th Cir. 1995).

In applying the *Jackson* standard, the court looks to state law to determine what evidence is needed to support a conviction of the crime charged. *Jackson*, 443 U.S. at 324 n.16; *Juan H.*, 408 F.3d at 1278 n.14. Thus, for both of petitioner's claims of insufficient evidence, the court begins with state law.

**1.   Sufficient Evidence Petitioner Knew Officer O'Gorman Was a Peace Officer**

Under California law, for a person to be guilty of assault upon the person of a peace officer with a semiautomatic firearm, the prosecution must prove, inter alia, that the person knew or reasonably should have known that the victim was a peace officer engaged in the performance of his or her duties. Cal. Pen. Code § 245(d)(2); *see* CT at 300 (jury instruction given). Similarly, to be guilty of the attempted murder of a peace officer, the prosecution must prove, inter alia, that the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of his or her duties. Cal. Pen. Code § 664(e); *see* CT at 288 (jury instruction given).

In rejecting petitioner's claim that there was insufficient evidence to support the conviction for assault with a deadly weapon against Officer O'Gorman, the Court of Appeal on direct appeal reasoned as follows:

> Just before the shooting incident, Anjelique and Calleros heard
> [petitioner] announce the police had arrived.[13] In response,
> [petitioner] turned off the residence's interior lights and ordered his

---

[13]   [Petitioner] admitted he had been informed that the police were approaching the residence.

52

victims to leave through the back.  Those actions made sense only if he believed investigating officers were out front.  When Anjelique disobeyed him and ran out the front door, [petitioner] followed her. Officer O'Gorman, dressed in a full police uniform, approached the front door as Anjelique ran out and across the street, away from the officer.  The officer drew his service revolver in his left hand and held it in front of him at chest height, pointing toward the front door, with his lighted flashlight held in his right hand just below his revolver. [Petitioner] came out of the door and fired from a distance of approximately eight feet, striking the officer's hand.

Given this record, it cannot seriously be doubted that [petitioner] must have known that Officer O'Gorman was a police officer at the relevant time.  [Petitioner] believed a police officer was approaching the house, took steps to conceal himself, and attempted to flee, and then fired directly at the officer from close range under circumstances in which the only reasonable inference was that his target was an officer conducting a criminal investigation.  [Petitioner] nevertheless points to testimony as to the lack of direct illumination in front of the house at the time of the shooting.  While it is true that Officer O'Gorman did not announce himself as a peace officer and both officers testified it was dark outside, that hardly negates a reasonable inference as to [petitioner's] ability to see the uniformed officer, much less his culpable knowledge based on the circumstances.  [Petitioner] fails to show it would have been impossible for [petitioner] to see his victim's uniform – there was ambient light from the nearby garage and a streetlight, as well as from

1   the officer's flashlight.[14]  Moreover, as stated above, from

2   [petitioner's] stated knowledge that the police had arrived and from

3   the way in which Officer O'Gorman conducted himself, evidence of a

4   precise visual identification was hardly necessary.

5   Lodged Doc. 7 at 19-20.

6        After considering the evidence presented at trial in the light most favorable

7   to the prosecution, and resolving all conflicts in the evidence in the manner most

8   favorable to the prosecution, the court finds that a rational trier of fact could have

9   found beyond a reasonable doubt that petitioner knew or reasonably should have

10  known Officer O'Gorman was a peace officer, at the time petitioner shot him.

11  Witnesses testified that petitioner stated he saw a police car and thought the police

12  were outside before he followed Anjelique out the front door, and that petitioner in

13  fact directed the others to leave through the back because the police were coming

14  to the front door.  RT at 212, 270, 272, 298.  Petitioner himself testified that

15  someone else said police were outside.  RT at 540.  Further, Officer O'Gorman

16  was dressed in full police uniform and approximately two to eight feet from

17  petitioner when petitioner first shot him.  RT at 152-55, 181-82, 212-14.

18       Although petitioner's defense theory was that he was not involved in the

19  shooting (RT at 540-41, 728), petitioner argues in the alternative that there is no

20  evidence indicating that he could have known that Officer O'Gorman was a police

21  officer due to the lack of light in the area, and because Officer O'Gorman did not

22  verbally announce himself as a police officer.  FAP Mem. at 72-73.  In support of

23  his argument, petitioner cites to Officer O'Gorman's testimony that the only light

24

25  ─────────────

26  [14]   [Petitioner's] appellate assertion that the officer's flashlight would have
    been shining in the assailant's face and prevented him from seeing is pure
27  speculation.

28

in the area was a street light behind Officer O'Gorman and a light in the detached garage. FAP Mem. at 72. Thus, petitioner concedes that this evidence was presented to the jury, and as a result, petitioner's arguments are nothing more than a request to have the court re-weigh the evidence and reach a different conclusion than the jury did. But it is not the function of this court to reweigh evidence presented at trial. *See Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000) ("It is not enough that we might have reached a different result ourselves or that as judges we may have reasonable doubt.").

Given the evidence here, a rational juror plainly could have concluded that petitioner knew or at least reasonably should have known that Officer O'Gorman was a police officer when he shot him. In light of the deference required under *Jackson* (to the jury's verdict) and AEDPA (to the Court of Appeal's decision), federal habeas relief on this claim is not warranted.

### 2.    Sufficient Evidence of Premeditation

In convicting petitioner of attempted murder of a peace officer, the jury also found, inter alia, that petitioner committed that attempted murder willfully, deliberately, and with premeditation. *See* Cal. Pen. Code § 664(f). Under California law, reviewing courts consider three categories of evidence to determine whether the evidence is sufficient to support a finding that a killing or attempted killing was willful, deliberate, and premeditated: prior planning, motive, and the manner of killing. *People v. Anderson*, 70 Cal. 2d 15, 26-27, 73 Cal. Rptr. 550, 447 P.2d 942 (1968); *People v. Villegas*, 92 Cal. App. 4th 1217, 1223-24, 113 Cal. Rptr. 2d 1 (2001). The three types of evidence are not an exhaustive list, and do not need to be present in some special combination or each accorded a particular weight. *People v. Pride*, 3 Cal. 4th 195, 247, 10 Cal. Rptr. 2d 636, 833 P.2d 643 (1992). Rather, they aid in assessing whether the killing or attempted

1    killing was the result of preexisting reflection.  *People v. Perez*, 2 Cal. 4th 1117,
2    1125, 9 Cal. Rptr.  2d 577, 831 P. 2d 1159 (1992).

3         Generally, the prosecution must show that preexisting reflection caused the
4    killing or attempted killing, and that it was not caused by unconsidered and rash
5    impulse.  *People v. Hughes*, 27 Cal. 4th 287, 370, 116 Cal. Rptr. 2d 401, 39 P.3d
6    432 (2002).  But premeditation and deliberation need not take place over any
7    extended period of time.  It is the extent of the reflection that counts, not the
8    duration of time.  "Thoughts may follow each other with great rapidity and cold,
9    calculated judgment may be arrived at quickly."  *People v. Koontz*, 27 Cal. 4th
10   1041, 1080, 119 Cal. Rptr. 2d 859, 46 P.3d 335 (2002) (internal quotation marks
11   and citations omitted).

12        Here, as the California Court of Appeal reasonably found, a rational trier of
13   fact could have found that petitioner's attempted murder of Officer O'Gorman was
14   premeditated and deliberate.  It reasoned as follows:

15        After shooting the officer, [petitioner] ran back inside the residence
16        and continued to fire shots in the officer's direction.  Forensic
17        evidence corroborated the officer's account of the events and
18        indicated that [petitioner] continued to fire at the officer even after
19        [petitioner's] firearm jammed, causing him to eject the unspent round
20        before firing again.  Finally, after shooting at the officer,  [petitioner]
21        attempted to hide his weapon and ammunition, and successfully fled
22        the scene.

23        There can be no serious doubt as to the adequacy of the
24        prosecution's case for premeditation.  [Petitioner] had ample time to
25        reflect both before he fired the shot that hit the officer, as well as after
26        he took cover and fired again.  He had an obvious motive to kill the
27        officer – avoidance of detection for the numerous crimes he had

28

1       committed that evening.  Finally, the manner of the shootings – a

2       direct shot from close range and another from a place of cover – tend

3       to refute  [petitioner's] contention that the shooting was an

4       "unthinking reaction" to seeing his victim outside the front door.

5   Lodged Doc. 7 at 20-21 (internal citations omitted).

6       The court agrees with the Court of Appeal's finding that the record reflects

7  the presence of all three *Anderson* types of evidence so as to support the jury's

8  finding that petitioner carried out his actions in a willful, deliberate, and

9  premeditated fashion.  As the Court of Appeal detailed, there was evidence of

10  planning and motive on the part of petitioner.  For example, despite knowing that

11  there were police in front of the house, petitioner still ran after Anjelique.  RT at

12  212, 269-72, 296-98, 540.  In addition, petitioner's motive in shooting Officer

13  O'Gorman was to avoid apprehension.  Indeed, petitioner testified that one of the

14  reasons he fled the scene was because he had just been released from jail.  RT at

15  194-95, 540.  The manner and nature of the attack also support a finding of

16  premeditation, since there was evidence that petitioner fired one shot at Officer

17  O'Gorman at close range, and then returned to the house to fire additional shots

18  while taking cover.  RT at 152-55.  This evidence was sufficient to reasonably

19  support a finding of premeditation in this case.  *See Davis v. Woodford*, 384 F.3d

20  628, 640 (9th Cir. 2004) ("verdicts are typically sustained when there is evidence

21  of all three types" of evidence under *Anderson* ) (internal quotation marks and

22  citation omitted); *People v. Lee*, 51 Cal. 4th 620, 636, 122 Cal. Rptr. 3d 117, 248

23  P.3d 651 (2011) (bringing loaded handgun to scene of shooting showed

24  premeditation and deliberation); *see also Koontz*, 27 Cal. 4th at 1082 (firing at a

25  vital area at close range, then preventing witness from calling ambulance, showed

26  deliberate intent to kill).

27

28

1        Accordingly, this court finds that, after viewing the evidence in the light

2   most favorable to the prosecution, a rational trier of fact could have found the

3   essential elements of the crime beyond a reasonable doubt.  *See Payne v. Borg*,

4   982 F.2d 335, 338 (9th Cir. 1992).   Because petitioner cannot demonstrate that

5   the rejection of either of his sufficiency of evidence claims by the state courts was

6   either contrary to or an unreasonable application of clearly established United

7   States Supreme Court authority, or based on an unreasonable determination of

8   fact, these claims do not merit habeas relief.

## VII.

## **RECOMMENDATION**

     IT IS THEREFORE RECOMMENDED that the District Court issue an

Order: (1) approving and accepting this Final Report and Recommendation; and

(2) directing that Judgment be entered denying the First Amended Petition and

dismissing this action with prejudice.

DATED: March 25, 2015

SHERI PYM
United States Magistrate Judge